1

2

3                    **UNITED STATES DISTRICT COURT**

4                    **NORTHERN DISTRICT OF CALIFORNIA**

5                    **SAN JOSE DIVISION**

6

7    MARY WANG,                              Case No.  19-cv-07997-BLF

8                    Plaintiff,

9         v.                                 **ORDER GRANTING MOTION TO
                                             DISMISS WITHOUT LEAVE TO**
10   COUNTY OF SANTA CLARA, et al.,          **AMEND**

11                   Defendants.             [Re:  ECF 40]

12

13        In the early morning hours of April 29, 2016, Andy Hsin Taso Fan ("Mr. Fan") tragically

14   ended his life while being held as a pretrial detainee at Elmwood Correctional Facility in the

15   County of Santa Clara. In the aftermath, Mr. Fan's wife and personal representative, Plaintiff

16   Mary Wang ("Ms. Wang"), brings this lawsuit for violations of 42 U.S.C. § 1983 against

17   Defendants Carl Neusel, Laurie Smith, Jamie Grumbos, Marcia Lidtke, Jay Choi, Amu

18   Perumattan, and the County of Santa Clara ("Defendants").  Before the Court is Defendants'

19   motion to dismiss. *See* Mot., ECF 40. After considering the briefing submitted by the parties,

20   including the supplemental briefing on qualified immunity and premises liability, and the oral

21   arguments presented at the July 23, 2020, hearing, the court GRANTS Defendants' motion

22   without leave to amend, and the case is DISMISSED.

23   **I.      BACKGROUND**

24        On January 2, 2016, Mr. Fan, suddenly and without provocation, assaulted Ms. Wang.

25   Second Am. Compl. ("SAC") ¶ 2, ECF 38. The next day, Mr. Fan took Ms. Wang for a medical

26   checkup, and medical personnel reported a possible case of domestic violence. SAC ¶ 3. Mr. Fan

27   was arrested on January 4, 2016, and he was taken to the Main Jail complex in Santa Clara

28   County. Am. to SAC ¶ 4, ECF 62. During the booking process, Mr. Fan was referred to the Adult

*United States District Court*
*Northern District of California*

Custody Health Services for a mental health screening since he was over sixty years old. Am. to SAC ¶ 4; Ex. F, Crisis Assessment ("Crises Assessment"), ECF 62[1]. Defendant Jamie Grumbos assessed Mr. Fan that day. Am. to SAC ¶ 4. According to the Crisis Assessment, Mr. Fan denied having any current mental health issues and denied a need for mental health services or medication support while in custody. Crisis Assessment 2. Mr. Fan also reported to Defendant Grumbos that he had not previously attempted suicide and denied any current suicidal ideations. *Id.* Defendant Grumbos also wrote in the assessment, "Current risk for suicidality seems low for this client," and "Client does not appear to be an imminent threat for suicide at this time." *Id.* This was Defendant Grumbos's only contact with Mr. Fan. After the booking and screening processes were complete, Mr. Fan was moved to the Elmwood Correctional Facility ("Elmwood"). Am. to SAC ¶¶ 4, 5. A protective order barring Mr. Fan from contacting Ms. Wang was entered on the day of his arrest. Ex. 1, Criminal Protective Order, ECF 40-1.

While Mr. Fan was at Elmwood, he had four appointments with mental health professionals. SAC ¶ 6. Mr. Fan's first appointment was on February 18, 2016. SAC ¶ 6.[2] Defendant Lidtke, a nurse practitioner, examined Mr. Fan. SAC ¶ 6; Ex. A, Outpatient Provider Admission Note ("Ex. A"), ECF 39. The Note states that Mr. Fan was referred this appointment because he couldn't sleep. Ex. A at 1. The Note states of Mr. Fan, "He currently admits to presence of sadness, anxiety at a level of 9 out of 10, angry, hopelessness, social isolation, decreased concentration, and insomnia. He admits to occasional SI [suicidal ideation] since he was booked, but denies any plan and contracts to safety." *Id.* Defendant Lidtke prescribed Mr. Fan the antidepressant Remeron and instructed him to take half a tablet before bed every night. *Id.* This was Defendant Lidtke's only interaction with Mr. Fan.

Mr. Fan's second mental health appointment was February 25, 2016, with Defendant Choi. SAC ¶ 6. This appointment was a welfare check for Mr. Fan, who had never previously been incarcerated. Ex. B, Crisis Soap Note ("Ex. B"), ECF 39. During the appointment, Mr. Fan told

[1] Ms. Wang has attached the jail medical records to the SAC.
[2] The date is incorrectly and impossibly listed as February 18, 2018, in the second amended complaint. The Note correctly lists the date as February 18, 2016. Ex. A

2

Defendant Choi that he was not suicidal. *Id.* Defendant Choi noted that Mr. Fan "Appeared to have depressed mood with low voices." *Id.* Defendant Choi kept Mr. Fan on his medication and scheduled a follow-up mental health appointment for March 14, 2016. *Id.*

Mr. Fan's third mental health appointment was March 14, 2016. SAC ¶ 6. Defendant Perumattam, a nurse practitioner, assessed him. SAC ¶ 6. Mr. Fan stated that he felt anxious. Ex. C, Outpatient Provider Progress Note ("Ex. C"), ECF 39. Concerning suicidal thoughts, Mr. Fan said that he had some in the beginning but not lately. *Id.* Defendant Perumattam and Mr. Fan discussed the side effects of his current medication, Remeron, and Mr. Fan consented to switching to Zoloft and Melatonin. *Id.* Mr. Fan was not told that a side effect of Zoloft is increased suicidal thoughts. SAC ¶ 6.

Defendant Perumattam again saw Mr. Fan for his fourth mental health appointment on April 11, 2016. SAC ¶ 6. Mr. Fan again denied any recent or current suicidal thoughts. Ex. D, Outpatient Provider Notes ("Ex. D"), ECF 39. He reported tolerating the Zoloft and Melatonin well and an improved mood, but he still had an ongoing depressed mood. *Id.* Mr. Fan stated that he was "ok, but I worry a lot." *Id.* His dose of Zoloft was increased to 75 mg daily, and the notes state that he was not interested in trying an increase to 100 mg daily. *Id.* This was Defendant Perumattam's final encounter with Mr. Fan.

On April 26, 2016, Santa Clara County Judge Charles Wilson modified the protective order barring Mr. Fan from having contact with his wife. Ex. 2, Tr. of Proceedings, ECF 40-1 ("Ex. 2"); Ex. 3, Modified Protective Order, ECF 40-1. The order was modified so Ms. Wang and Mr. Fan could speak via telephone while he was in custody. Ex. 2. According to Mr. Fan's lawyer, Ms. Wang and Mr. Fan needed to discuss financial issues. *Id.*

Mr. Fan and Ms. Wang spoke via telephone on April 28, 2016. SAC ¶ 7. The two argued, and Mr. Fan was very upset after the call. SAC ¶ 7. The call was monitored by Santa Clara County Sheriff's personnel. SAC ¶ 7. That night, Mr. Fan made written documents typical of someone contemplating suicide. SAC ¶ 7.

At approximately 5:00 a.m. on April 29, 2016, another person in custody, Craig Bryan, noticed Mr. Fan behaving unusually. SAC ¶ 7. When Mr. Fan walked out of their unit a second

United States District Court
Northern District of California

1    time, Mr. Bryan looked to see where Mr. Fan had gone. SAC ¶ 7. Mr. Bryan saw Mr. Fan

2    climbing over a railing on the second floor. Am. to SAC ¶ 5; SAC ¶ 7. Mr. Bryan screamed in

3    attempt to get Mr. Fan to stop. SAC ¶ 7. It was too late, and Mr. Fan landed with a thud on the

4    floor. SAC ¶ 7. He died as a result of his injuries shortly after the fall. SAC ¶ 7.

5         Ms. Wang filed her initial complaint on February 9, 2017, in state court. Not. of Removal ¶

6    2, ECF 1. Defendants filed a notice of removal with this Court on December 5, 2019. *See* Not. of

7    Removal. Ms. Wang filed the operative version of her complaint on April 7, 2020. *See* SAC. Ms.

8    Wang asserts five causes of action under 42 U.S.C. § 1983: 1) deliberate indifference to mental

9    health needs during the booking process against Defendant Grumbos; 2) deliberate indifference in

10   providing mental health treatment against Defendants Grumbos, Lidtke, Choi, and Perumattam; 3)

11   deliberate indifference to mental health needs during the determination of housing assignment

12   against Defendant Grumbos;[3] 4) deliberate indifference by a supervisory official against

13   Defendants Neusel and Smith; and 5) deliberate indifference in maintaining an unsafe premises

14   against Defendant Smith and a Monell claim for municipal liability against Defendant County of

15   Santa Clara ("the County").

16        Defendants filed a motion to dismiss the second amended complaint on April 21, 2020. *See*

17   Mot. Ms. Wang filed an opposition brief on May 6, 2020. *See* Opp'n, ECF 43. Defendants timely

18   filed their reply on May 12, 2020. *See* Reply, ECF 52. At the Court's direction, Ms. Wang filed

19   supplemental briefing on qualified immunity and premises liability on August 7, 2020, *see* Pl.'s

20   Suppl. Br., ECF 60, and Defendants filed a reply on August 13, 2020. *See* Reply, ECF 64.

21

22   **II.    LEGAL STANDARD**

23          **A.  MOTION TO DISMISS**

24        "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

25   claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation*

26

27   ───────────────
[3] While Santa Clara County Deputy Sheriffs Marlene Golino, Gilberto Rios, and Resendo Serna
28   are specifically named in the third cause of action, Ms. Wang's counsel confirmed during the July
     24 hearing that they are not parties to this case.

United States District Court
Northern District of California

*Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

In deciding whether to grant leave to amend, the Court must consider the factors set forth by the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962), and discussed at length by the Ninth Circuit in *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2009). A district court ordinarily must grant leave to amend unless one or more of the *Foman* factors is present: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment. *Eminence Capital*, 316 F.3d at 1052. "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight." *Id.* However, a strong showing with respect to one of the other factors may warrant denial of leave to amend. *Id.* Dismissal without leave to amend is proper only if it is clear that "the complaint could not be saved by any amendment." *Intri-Plex Techs., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1056 (9th Cir. 2007) (internal citations and quotations omitted).

**B.  QUALIFIED IMMUNITY**

"The doctrine of qualified immunity protects government officials from liability for civil

5

1    damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or

2    constitutional right, and (2) that the right was 'clearly established' at the time of the challenged

3    conduct.'" *Wood v. Moss*, 134 S. Ct. 2056, 2066–67 (2014) (quoting *Ashcroft v. al-Kidd*, 131 S.

4    Ct. 2074, 2080 (2011)). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a

5    two-part approach for analyzing qualified immunity. The analysis contains both a constitutional

6    inquiry and an immunity inquiry. *Johnson v. County of Los Angeles*, 340 F.3d 787, 791 (9th Cir.

7    2003). The constitutional inquiry requires the court to determine this threshold question: "Taken in

8    the light most favorable to the party asserting the injury, do the facts alleged show the officer's

9    conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If the Court determines that a

10   constitutional violation could be made out based on the parties' submissions, the second step is to

11   determine whether the right was clearly established. *Id.* "The relevant, dispositive inquiry in

12   determining whether a right is clearly established is whether it would be clear to a reasonable

13   officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

14         The Supreme Court has clarified that the sequence of analysis set forth in *Saucier* is not

15   mandatory and that a court may exercise its sound discretion in determining which of the two

16   prongs of the qualified immunity analysis to address first. *Pearson v. Callahan*, 555 U.S. 223,

17   241–02 (2009). Thus, in some cases, it may be unnecessary to reach the ultimate constitutional

18   question when officers would be entitled to qualified immunity in any event, a result consistent

19   with longstanding principles of judicial restraint.

20         The Supreme Court has also emphasized that qualified immunity should be resolved "at

21   the earliest possible stage of the litigation." *Wood v. Moss*, 572 U.S. 744, 755 n.4 (2014).  The

22   Court may grant a motion to dismiss under Rule 12(b)(6) on qualified immunity grounds if the

23   facts pled in the complaint, taken as true, would nonetheless result in a defendant being entitled to

24   qualified immunity. See, e.g., *Iqbal* at 685-86 ("The basic thrust of the qualified immunity

25   doctrine is to free officials from the concerns of litigation.").

26         The Supreme Court recently reiterated the longstanding principle that "the clearly

27   established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500,

28   503 (2019). Defining the right at too high a level of generality "avoids the crucial question

whether the official acted reasonably in the particular circumstances that he or she faced." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Plumhoff v. Ricard*, 134 S. Ct. 2012, 2023 (2014)). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct at 2023.

Importantly, though, "'it is not necessary that the alleged acts have been previously held unconstitutional' in order to determine that a right was clearly established, 'as long as the unlawfulness [of defendant's actions] was apparent in light of pre-existing law.'" *Bonivert v. City of Clarkston*, 883 F.3d 865, 872 (9th Cir. 2018) (quoting *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977 (9th Cir. 2005)) (alterations in original). There can be "the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Vazquez v. City of Kern*, 949 F.3d 1153, 1164 (9th Cir. 2020) (quoting *Wesby*, 138 S. Ct. at 590). The relevant inquiry is "whether the officer had fair notice that her conduct was unlawful." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 690 (9th Cir. 2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)).

## III.   DISCUSSION

### A.   Judicial Notice

Defendants have filed a request for judicial notice ("RJN") in connection with their motion to dismiss. *See* Defs.' RJN, ECF 40-1. Specifically, Defendants asks the Court to take judicial notice of three documents, attached to the RJN as Exhibits 1-3: a copy of a Criminal Protective Order-Domestic Violence filed January 6, 2016, in Santa Clara County Superior Court Case No. C1628111 (Ex. 1); a copy of the court reporter's transcript of proceedings dated April 26, 2016, in the case of the *People of the State of California v. Andy Hsintao Fan*, Santa Clara County Superior Court Case No. C1628111 (Ex. 2); and a copy of an April 26, 2016, Minute Order in the case of the *People of the State of California v. Andy Hsintao Fan*, Santa Clara County Superior Court Case Number C1628111 (Ex. 3). Plaintiff has not objected. Judicial notice is proper as to all of

these documents. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir.

2006) ("We may take judicial notice of court filings and other matters of public record.").

### B. Deliberate Indifference Claims Against Defendants Choi, Grumbos, Lidtke, and Perumattam

The claims against Defendants Choi, Grumbos, Lidtke, and Perumattam ("medical

professional Defendants") all involve allegations of violations of the right to adequate medical

care in the form of mental health treatment. SAC ¶¶ 15-16, 28; Am. to SAC ¶¶ 4-5. Medical care

claims brought by pretrial detainees "arise under the Fourteenth Amendment's Due Process

Clause, rather than under the Eighth Amendment's Cruel and Unusual Punishment Clause."

*Gordon v. County of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018) (quoting *Castro v. County of

Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)). These claims must be evaluated under an

objective deliberate indifference standard. *Gordon*, 888 F.3d at 1124-25.

The elements of a pretrial detainee's medical care claim against an individual defendant

under the due process clause of the Fourteenth Amendment are: (i) the defendant made an

intentional decision with respect to the conditions under which the plaintiff was confined; (ii)

those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant

did not take reasonable available measures to abate that risk, even though a reasonable official in

the circumstances would have appreciated the high degree of risk involved—making the

consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the

defendant caused the plaintiff's injuries. *Id*. at 1125. "With respect to the third element, the

defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the

facts and circumstances of each particular case.'" *Id*. (quoting *Kingsley v. Hendrickson*, 576 U.S.

389, 397 (2015)).

The Court first turns to prong two of the qualified immunity analysis: whether the

constitutional right was 'clearly established' at the time of the challenged conduct. Defendants

properly raise a qualified immunity defense for the medical professional Defendants. Mot. 9-11.

"Once the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden

of showing that the rights allegedly violated were 'clearly established.'" *LSO, Ltd. v. Stroh*, 205

United States District Court
Northern District of California

F.3d 1146, 1157 (9th Cir. 2000).

The Ninth Circuit has emphasized in no uncertain terms that it is the plaintiff's burden to define the right with specificity and identify prior precedent. "The Supreme Court has repeatedly instructed that we examine 'whether the violative nature of *particular* conduct is clearly established' by controlling precedent, not whether the conduct violates a general principle of law." *Sharp v. County of Orange*, 871 F.3d 901, 910 (9th Cir. 2017) (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (per curiam)). "Except in the rare case of an 'obvious' instance of constitutional misconduct (which is not presented here), Plaintiffs must '*identify a case* where an officer acting under similar circumstances as [defendants] was held to have violated'" the constitutional amendment at issue. *Sharp*, 871 F.3d at 911 (alteration and emphasis in original) (quoting *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (per curiam)). "To achieve that kind of notice, the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction. *Sharp*, 871 F.3d at 911 (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

This case is not the rare instance involving obvious constitutional misconduct. To defeat qualified immunity on the claims against the medical provider Defendants, Ms. Wang needed to identify a case that is controlling precedent and addresses similar circumstances as those present here. At most, Ms. Wang has identified at a high level that pretrial detainees have a right to adequate medical care, and the adequacy of such care is judged according to the circumstances present. None of the cases Ms. Wang cites establish the constitutionally required level of medical care for the circumstances Mr. Fan was in at the time of his treatment.

*Clouthier v Contra Costa County*, 591 F.3d 1232, 1241 (9th Cir. 2010), *overruled by Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) is factually distinguishable. *Clouthier* involved a pretrial detainee with a history of past suicide attempts and hospitalizations who presented as suicidal at the time of booking. He was placed on suicide watch, and the Ninth Circuit held that it was clearly established that a reasonable mental health professional would not have removed key suicide prevention measures put in place by a prior mental health staff member. *Clouthier*, 591 F.3d at 1245. These were not the circumstances facing Mr. Fan, who had no prior

notable mental health history and did not present as suicidal at the time of booking.

Ms. Wang also cites *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1459 (9th Cir. 1988), *vacated*, 490 U.S. 1087 (1989) and *McGuckin v. Smith*, 974 F.2d 1060, 1061 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc), but neither case discusses qualified immunity. Another case cited by Ms. Wang, *Estelle v. Gamble*, 429 U.S. 97 (1976), involved an incarcerated man suing prison officials for inadequate treatment of a back injury he sustained while performing a prison work assignment. While the Court held that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment, those circumstances were not present here because a medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. *Id.* at 104, 107 (internal citation omitted). *Estelle* is factually distinguishable from the present case, which involves claims of insufficient mental health treatment at booking and throughout Mr. Fan's incarceration. Finally, *Farmer v. Brennan*, 511 U.S. 825 (1994), also cited by Ms. Wang, likewise could not put the medical professional Defendants on notice that their conduct was unconstitutional because it doesn't involve mental health treatment.

Defendants cite *Horton v. City of Santa Maria*, 915 F.3d 592 (9th Cir. 2019), where the Ninth Circuit held that a reasonable officer would not have known from case law that a twenty-seven minute delay in observation of a pretrial detainee who was a known suicide risk would violate his rights. *Id.* at 597-601. If that is the case, Defendants reason, then there can't possibly be liability here for not constantly monitoring a pretrial detainee who did not present as a known suicide risk. With this backdrop, the Court evaluates Ms. Wang's claims against each individual Defendant.

### 1. Defendant Grumbos

When Mr. Fan was first arrested on January 4, 2016, he was referred to the Adult Custody Health Services for a mental health screening. Am. to SAC ¶ 4. Defendant Grumbos completed this mental health screening the same day as Mr. Fan's arrest. *Id.* Ms. Wang alleges that Mr. Fan was referred to the Adult Custody Health Services because of his age, the fact that this was his

10

first time in custody, and due to the serious mental break he suffered prior to his arrest. *Id.* This directly contradicts the Crisis Assessment that Ms. Wang attached to the complaint. *See* Crisis Assessment. The Crisis Assessment states that the reason for Mr. Fan's referral was because he was over sixty years old. *Id.* Further, according to the Crisis Assessment, Mr. Fan denied any current mental health issues, the need for any mental health services, and any suicidal ideations. *Id.* Ms. Wang alleges that Defendant Grumbos was aware of the circumstances leading to Mr. Fan's arrest, including the fact that it was out-of-character for Mr. Fan to behave like that and that the "sudden commencement and stopping of each of the attacks indicated a serious mental health issue." Am. to SAC ¶ 4. The Court finds this to be an implausible inference: Ms. Wang has not pled any facts suggesting that Defendant Grumbos had received the arresting officer's report at the time of her assessment, which occurred the same day Mr. Fan was arrested. Ms. Wang also alleges that Mr. Fan should have received an individualized treatment plan from Defendant Grumbos, not placement into a drug treatment program, and this was a violation of policy. SAC ¶ 15.

Finally, Ms. Wang alleges that Mr. Fan's housing assignment on the second floor with access to the rail was a result of the intentional indifference of Defendant Grumbos since she failed to refer Mr. Fan to a doctor for a medical examination. Am. to SAC ¶ 5. Ms. Wang claims that Defendant Grumbos should have placed Mr. Fan on suicide watch. SAC ¶ 16.

To evaluate whether Defendant Grumbos is entitled to qualified immunity, the Court considers the following: Was it clearly established that a medical professional must refer a pretrial detainee who denies any present mental health issues or suicidal ideations to a doctor for a medical examination? In light of its review of the cases cited by Ms. Wang, the Court finds that this right was not clearly established. Next: Was it clearly established that a medical professional must place a pretrial detainee who denies any present mental health issues or suicidal ideations on suicide watch or in any special housing unit? The Court again finds that this right was not clearly established. Accordingly, Defendant Grumbos is entitled to qualified immunity.

### 2.  Defendant Lidtke

Defendant Lidtke, a nurse practitioner, evaluated Mr. Fan once, on February 18, 2016. SAC ¶ 6. Her Outpatient Provider Admission Note states that Mr. Fan was referred this

appointment because he couldn't sleep. Ex. A at 1. The Note states of Mr. Fan, "He currently admits to presence of sadness, anxiety at a level of 9 out of 10, angry, hopelessness, social isolation, decreased concentration, and insomnia. He admits to occasional SI [suicidal ideation] since he was booked, but denies any plan and contracts to safety." *Id.* Defendant Lidtke prescribed Mr. Fan the antidepressant Remeron and instructed him to take half a tablet before bed every night. *Id.* This was Defendant Lidtke's only interaction with Mr. Fan. Ms. Wang alleges that Defendant Lidtke knew or should have known that Mr. Fan was at high risk of committing suicide since "he was 72 years old, charged with a crime of a highly emotional nature, had never been incarcerated before, etc." SAC ¶ 20. Ms. Wang further alleges that the mental health staff, including Defendant Lidtke, failed to take any efforts to see that Mr. Fan was placed on suicide watch, additional observation, or assigned to more secure housing. SAC ¶ 28.

To decide if Defendant Lidtke is entitled to qualified immunity, the Court evaluates whether it was clearly established that it was not enough to place a 72-year-old pretrial detainee who had been charged as a crime of a highly emotional nature and currently presenting with insomnia and anxiety, but no present suicidal ideations, on anti-depressant medication and whether it was clearly established that this pretrial detainee presenting with insomnia and anxiety, but no present suicidal ideations, needed to be placed on suicide watch or in more restrictive housing. Ms. Wang has not identified a case indicating this right was clearly established. The Court finds that Defendant Lidtke is entitled to qualified immunity.

### 3.  Defendant Choi

Defendant Choi, a therapist, evaluated Mr. Fan once, on February 26, 2016. SAC ¶¶ 6, 23. During the appointment, Mr. Fan told Defendant Choi that he was not suicidal. Ex. B. Defendant Choi noted that Mr. Fan "Appeared to have depressed mood with low voices." *Id.* Defendant Choi kept Mr. Fan on his medication and scheduled a follow-up mental health appointment for March 14, 2016. *Id.* Ms. Wang alleges the same claims against Defendant Choi as she did against Defendant Lidtke: Defendant Choi knew or should have known that Mr. Fan was at high risk of committing suicide since "he was 72 years old, charged with a crime of a highly emotional nature, had never been incarcerated before, etc." SAC ¶ 20. Further, Defendant Choi failed to take any

12

efforts to see that Mr. Fan was placed on suicide watch, additional observation, or assigned to more secure housing. SAC ¶ 28.

The Court finds Defendant Choi is entitled to qualified immunity because it was not clearly established that a pre-trial detainee with Mr. Fan's characteristics and prescribed anti-depressant medication who denies being suicidal should be placed on suicide watch or in more restrictive housing.

### 4. Defendant Perumattan

Defendant Perumattan, a nurse practitioner, saw Mr. Fan twice: first on March 14, 2016, and then again on April 14, 2016. SAC ¶¶ 24, 26. According to the Outpatient Provider Progress Note from the March 14, 2016 appointment, Mr. Fan stated that he felt anxious and that he had some suicidal thoughts at the beginning of his incarceration but none lately. Ex. C. With Mr. Fan's consent, Defendant Perumattan changed his medication from Remeron to Zoloft and Melatonin. *Id.* Ms. Wang alleges that Zoloft is known to increase suicidal ideation, and no steps were taken to observe or otherwise reduce the risk of suicide for Mr. Fan. SAC ¶ 25. Ms. Wang also alleges that Defendant Perumattan did not tell Mr. Fan that Zoloft could increase suicidal thoughts. SAC ¶ 6. When Defendant Perumattan saw Mr. Fan for the second time on April 11, 2016, Mr. Fan reported tolerating the Zoloft and Melatonin well and a slightly improved mood, according to the Outpatient Provider Notes. Ex. D; SEC ¶ 6. Mr. Fan reported an ongoing depressed mood and stated that he was "ok, but I worry a lot." Ex. D. He again denied any recent or current suicidal thoughts. *Id.* His dose of Zoloft was increased to 75 mg daily, and the notes state that he was not interested in trying an increase to 100 mg daily. *Id.* Ms. Wang alleges Defendant Perumattan knew or should have known that Mr. Fan was at high risk of committing suicide since "he was 72 years old, charged with a crime of a highly emotional nature, had never been incarcerated before, etc." SAC ¶ 20. Further, Defendant Perumattan failed to take any efforts to see that Mr. Fan was placed on suicide watch, additional observation, or assigned to more secure housing. SAC ¶ 28.

In light of the absence of any controlling authority cited by Ms. Wang, the Court finds that Defendant Perumattan is entitled to qualified immunity because it was not clearly established that a pretrial detainee on Zoloft who denied any recent or current suicidal thoughts required placement

1    on suicide watch or in more restrictive housing.

2         **5.  Conclusion**

3         The Court finds that Ms. Wang has not met her burden of showing that the rights allegedly

4    violated in this case were "clearly established" with the required level of specificity. It is not

5    clearly established that every person with mild depression must be placed under the harsh

6    conditions of suicide watch. Had a medical provider evaluated Mr. Fan after the upsetting phone

7    call with Ms. Wang on April 28, 2016, the Court's analysis might be different. But there are no

8    allegations that any of the medical professional Defendants saw Mr. Fan after the call on the night

9    of April 28, when he was very upset, and before 5:00 a.m. on April 29, when he climbed over the

10   second-floor rail. What happened in this case is a tragedy. But not every tragedy is a constitutional

11   violation. The Court GRANTS Defendants' motion to dismiss as to the claims against Defendants

12   Choi, Grumbos, Lidtke, and Perumattam. Since further amendment would be futile, the dismissal

13   is without leave to amend.

14        **C.  Deliberate Indifference Against Defendant Supervisors Neusel and Smith**

15        In their reply brief, Defendants argue that, by not opposing their motion to dismiss on the

16   fourth cause of action against Defendant supervisors Neusel and Smith, Ms. Wang abandoned this

17   cause of action. Reply 6. When this was mentioned at the July 24 hearing, Ms. Wang's counsel did

18   not contest this point. Therefore, the Court GRANTS Defendant's motion to dismiss as to the

19   supervisory claims against Defendants Neusel and Smith without leave to amend.

20        **D.  Premises Liability Against Defendants Smith and County of Santa Clara**

21        "A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy,

22   practice, or custom of the entity can be shown to be a moving force behind a violation of

23   constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing

24   *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978)).  "In

25   order to establish liability for governmental entities under *Monell*, a plaintiff must prove '(1) that

26   [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the

27   municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's

28   constitutional right; and, (4) that the policy is the moving force behind the constitutional

United States District Court
Northern District of California

14

1    violation.'" *Dougherty*, 654 F.3d at 900 (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*,

2    130 F.3d 432, 438 (9th Cir. 1997)) (alterations in original). The policy may be formal or informal.

3    *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988). An isolated incident that leads to a

4    constitutional deprivation is not sufficient to make out a policy, practice, or custom. *Christie v.*

5    *Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

6    Rather, the policy, practice, or custom must be "so permanent and well settled" as to constitute

7    "the force of law." *Praprotnik*, 485 U.S. at 127. The deliberate indifference standard for municipal

8    liability under § 1983 is an objective inquiry. *Castro*, 833 F.3d at 1076.

9           In *Castro*, which was decided after Mr. Fan's death, Defendants had a custom of housing

10   intoxicated pretrial detainees in sobering cells that contained inadequate audio monitoring. *Id.* at

11   1075. The Ninth Circuit chose not to decide the question of whether the architecture of the West

12   Hollywood police station's sobering cell could be a policy, custom, or practice. *Id.* Instead, the

13   Ninth Circuit found that "the design of the cell is only the backdrop for the entity defendants'

14   policy or custom, as described in the jury instructions and as reflected in the record." *Id.*

15   Defendants made "deliberate choices *in light of the* poor design and location of the sobering cell."

16   *Id.* There was a custom of housing intoxicated persons in sobering cells that contained inadequate

17   audio monitoring and only checking on them every thirty minutes despite the availability of other

18   cells to detain intoxicated persons. *Id.* "These routine practices were consciously designed and,

19   together, they amount to a custom or policy. The custom or policy, in summary, was to use a

20   sobering cell that lacked adequate audio surveillance to detain more than one belligerent drunk

21   person while checking the cell visually only once every half hour." *Id.* The Ninth Circuit found

22   that this custom or policy caused Castro's injury because had Defendants provided consistent

23   monitoring or required Castro and his attacker to be housed in different locations, which were

24   available, then the attack could have been averted. *Id.* at 1075-76.

25          Here, Ms. Wang focuses on the architecture of the facility. Ms. Wang alleges in conclusory

26   fashion that several inmates have killed themselves by jumping off the second floor at Elmwood,

27   committing suicide in exactly the same way as Mr. Fan, and the County did not take any

28   corrective actions such as welding a metallic grill over the opening above the second-floor rail.

United States District Court
Northern District of California

15

SAC ¶¶ 39, 40. Ms. Wang alleges that this design "was grossly negligent with reckless disregard for the safety of inmates." SAC ¶ 38. But Ms. Wang does not point to a single specific incident of an inmate committing suicide by jumping over the second-floor railing prior to Mr. Fan's death that would have put the County on notice to a design defect. And in response to Defendants' motion to dismiss, Ms. Wang's only defense of this claim, if it can be called that, is one sentence stating, "[t]he design of the building is under the control of the sheriff." Opp'n 6.

Rather than dismiss the claim as abandoned, the Court allowed Ms. Wang's counsel to amend this claim only if he could certify under Rule 11 that his investigation has given him reason to put forth allegations of factually similar suicides that used the same instrumentality, the second-floor rail, that would have put the Defendants on notice as to the design defect. In his supplemental briefing, counsel cites the overall suicide statistics for the Santa Clara County Department of Corrections. Pl.'s Suppl. Br. 3. Counsel does not cite the relevant statistics for Elmwood or the instrumentalities involved in any of the deaths. A website cited by Ms. Wang likewise does not provide any details about any suicides at Elmwood involving the second-floor railing. *Id.* Ms. Wang alleges a June 22, 2017, incident in which an incarcerated man fell from the second floor and suffered fatal injuries, *id.*, but this incident occurred more than a year after Mr. Fan's death. Ms. Wang's allegation that Santa Clara County Department of Corrections contracted with Sabot Consulting to review and evaluate their operation on December 15, 2016, *id.*, lacks any factual support for the proposition that Defendant Smith and the County were on notice that the jail's design was leading to multiple suicides. Defendants state that, in response to Ms. Wang's interrogatories, they provided documentation showing that no incarcerated persons committed suicide at Elmwood in the five years preceding Mr. Fan's death. Defs.' Suppl. Br. 3, ECF 63.

The Court finds that, after two years of discovery, Ms. Wang has failed to plead facts sufficient to give the requisite notice to Defendant Smith and the County. Ms. Wang has submitted two amended complaints, an amendment to the second amended complaint, and supplemental briefing in attempt to state a claim for relief. The Court finds the *Foman* factors of repeated failure to cure deficiencies by amendment and futility of further amendment present in this case. Therefore, the Court GRANTS Defendants' motion to dismiss without leave to amend.

**IV.   ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that Defendants' motion to dismiss be GRANTED without leave to amend. Ms. Wang's case is DISMISSED.

Dated:  October 5, 2020

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California